UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| AUDREY A. BARLOW, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:10-CV-1273 (CEJ) |
| | ) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On August 16, 2007, plaintiff Audrey Barlow filed an application for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, with an alleged onset date of February 20, 2006.[1] (Tr. 104-11). After plaintiff's application was denied on initial consideration (Tr. 65-71), she requested a hearing from an Administrative Law Judge (ALJ) (Tr. 74).

The hearing was held on June 4, 2009. (Tr. 25-64). Plaintiff was represented by counsel. The ALJ issued a decision denying plaintiff's claims on July 1, 2009. (Tr. 6-17). The Appeals Council denied plaintiff's request for review on May 20, 2010. (Tr. 1-5). Accordingly, the ALJ's decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g). A second application for benefits was granted by an ALJ on December 22, 2010, finding that plaintiff was disabled as of July 2, 2009. Plaintiff

_____

[1]She later amended the date of onset to January 30, 2006. (Tr. 117).

seeks a determination of disability for the period ending July 1, 2009. Pl. Brief at 1 [Doc. #17].

## II. Evidence Before the ALJ

At the time of the hearing, plaintiff was 37 years old. (Tr. 31). She resided in Robertsville, Missouri, in a mobile home with her two youngest daughters, ages 13 and 15. Plaintiff's 20-year-old daughter was married and had two children; her 18-year old daughter lived with a grandparent after being released from a behavioral institute. (Tr. 30). Plaintiff testified that she left school in the seventh grade because she got married. She did not have her GED. (Tr. 31).

Plaintiff testified that she had been unable to work since January 30, 2006, when she sustained an on-the-job injury and ruptured a disc in her lower back. (Tr. 34-35).[2] Her work for a manufacturer required her to move 70-pound boxes onto a lift. Id. She had surgery to repair the disc at L5/S1 in 2006, but continued to experience pain. She testified that she had been told that she also needed a spinal fusion but faced delay while waiting for surgeon who accepts Medicaid. (Tr. 44). She also acknowledged that she has to quit smoking before the surgery can be performed. Id. She smoked about a pack of cigarettes a day. (Tr. 45). Plaintiff also testified that she received injections to treat a cervical disc that "locks up." (Tr. 45-46). Plaintiff's medications included

---

[2]Plaintiff testified that her worker's compensation claim was denied, but she received a settlement of $10,000. (Tr. 33-34).

Neurontin,[3] Tramadol,[4] and Naproxen.[5]  (Tr. 46).  She testified that pain interferes with her ability to focus and concentrate and may prevent her from getting out of bed as many as 10 to 14 days in a month.  (Tr. 55, 57).   In addition to pain in her low back and neck, plaintiff testified that she has "nodes" on her lymph nodes (Tr. 47), irritable bowel syndrome, uterine tumors, and endometriosis, which causes severe pain and bleeding.  (Tr. 54).

Plaintiff's past employment included factory work (Tr. 36, 41), food preparation and service at fast food restaurants (Tr. 37-39, 41), and badge making and silkscreen printing.  (Tr. 40).  The ALJ asked why her employment history did not begin until 1993 and she stated that she was "not allowed to work" while she was married.  She did not seek employment until she separated from her husband in 1993.  (Tr. 43).

Plaintiff testified that she cooks for herself and her two youngest children, does laundry, and occasional vacuuming.  She takes care of the family cat.  Her daughters assist her with grocery shopping and dish washing; a neighbor mows her lawn.  (Tr. 49-50, 52).  She estimated that she can walk about 30 minutes, with stops to rest; she can stand about 5 or 10 minutes, and sit for about 10 or 15 minutes.  She does not lift

---

[3]Neurontin is used to treat certain types of seizures in people with epilepsy and to relieve the pain of postherpetic neuralgia, the pain or aches that may occur after an attack of shingles.  It is also prescribed for the treatment of restless leg syndrome, neuropathy, and hot flashes.   It may be prescribed for other uses as well. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000940/ (last visited on July 25, 2011).

[4]Tramadol is prescribed for treatment of moderate to moderately severe pain. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Nov. 6, 2009).

[5]Naproxen is the generic name for Naprosyn, a nonsteroidal anti-inflammatory drug used for relief of the signs and symptoms of tendonitis and pain management. See Phys. Desk Ref. 2769-70 (60th ed. 2006).

more than 20 pounds. (Tr. 51). Bending or stooping causes pain and makes her feel off balance. (Tr. 52).

Dolores Gonzales, M.Ed., a vocational expert, provided testimony regarding the employment opportunities for an individual with plaintiff's education, training and work experience; who is limited to lifting and carrying up to 20 pounds occasionally and 10 pounds frequently; who can sit, stand or walk 6 hours in an 8-hour day; with occasional climbing of stairs and ramps, stooping, kneeling, and crouching; and who must avoid concentrated exposure to vibrations, cold and wetness.[6] (Tr. 103, 60). Ms. Gonzales opined that such an individual could return to plaintiff's past work as a fast food worker and could also perform work as an order caller or ticket taker. (Tr. 60-61). The ALJ next asked the VE to assume that the individual required a sit/stand option with the ability to change position frequently. (Tr. 61). The VE opined that such an individual would be able to work as a ticket taker and cashier. Finally, the ALJ asked the VE to assume that the individual required frequent naps and absences of two weeks in every month. In response, the VE responded that such restrictions would preclude employment. (Tr. 62). Plaintiff's counsel asked the VE to assume that the hypothetical individual was limited to sedentary, unskilled work, with the additional impairment of pain that would preclude persisting or focusing in simple tasks eight hours a day, five days a week. The VE opined that these additional limitations would preclude competitive employment. Id.

The record contains a Disability Report completed by plaintiff. (Tr. 119-26). She listed "back injury" as her disabling condition. She stated that she herniated a disc

---

[6]These limitations reflect those developed by the examining consultant on November 14, 2007. (Tr. 217-22).

-4-

when she bent over to pick up a shampoo bottle in the shower.  (Tr. 120).  She wrote that she cannot get out of bed if she "sleeps wrong."  Lifting, cleaning, washing dishes and standing or sitting for too long all cause back pain.  Plaintiff's medications included Naproxen and Oxycodone.[7]  (Tr. 124).  An updated report completed on May 15, 2009, listed plaintiff's medications as Trazodone,[8] Neurontin, Tramadol, Vicodin,[9] and Restoril.[10]  (Tr. 152).

Plaintiff completed a Function Report.  (Tr. 127-42).  In describing her daily activities, she stated that she makes coffee, does a little house work, cooks for her children, and sits or rests.  (Tr. 127).  Her back injury affects her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, and climb stairs.  (Tr. 133).  She can walk about 100 feet before needing to rest for at least 10 minutes.  She is able to handle a savings account, use a checkbook, pay bills, and count change (Tr. 130), and has no difficulty getting along with others.  (Tr. 132-33).  She does not handle stress or changes in routine well.  (Tr. 132).  She can watch television for about one hour at a time.  (Tr. 131).  In a narrative portion, plaintiff wrote that she has trouble getting out of bed in the mornings due to pain.  She finds it hard to stand long enough to do the dishes and

---

[7]Ocycodone Acetaminophen is also known as Percocet.  Ocycodone is an opioid analgesic indicated for relief of moderate to moderately severe pain.  It can produce drug dependence.  See Phys. Desk. Ref. 1114 (60th ed. 2006).

[8]Trazodone is a seratonin modulator prescribed for the treatment of depression. It may also be prescribed for the treatment of schizophrenia and anxiety. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).

[9]Vicodin is a narcotic analgesic indicated for relief of moderate to moderately severe pain.  Dependence or tolerance may occur.  See Phys. Desk. Ref. 530-31 (60th ed. 2006).

[10]Restoril is the brand name for Temazepam.  It is a benzodiazepine indicated for short-term treatment of insomnia.  http://www.nlm.nih.gov/medlineplus/druginfo /meds/a684003.html (last visited on July 29, 2011).

she cannot sit or lie in one position for very long. She is "miserable" for a day or two after driving and grocery shopping. She stated that it has been a "big adjustment" to be restricted in her activities after an active lifestyle that included full-time work, and nights out bowling or dancing. (Tr. 134).

### III. Medical Evidence

The record contains treatment notes of plaintiff's care at Cedar Hill Family Medicine, beginning in 1999.[11] The first reference to issues relevant to this matter occurs on July 21, 2005, when plaintiff reported pain in her right shoulder and knee and both hips.[12] (Tr. 267). On examination, it was noted that plaintiff had muscle spasms in the paravertebral muscles of the cervical spine and the trapezial muscle. Plaintiff was given an injection of Toradol[13] and a prescription for Norflex.[14] She still had pain in her neck and right shoulder on August 1, 2005, and received another injection on August 10, 2005. (Tr. 266, 263).

On January 23, 2006, plaintiff reported low back pain. (Tr. 252). She recalled lifting and twisting several days earlier but could not be certain this was the cause of her pain. On examination, some muscle spasm and tenderness of the lumbosacral

---

[11]Plaintiff has an extensive treatment record with Cedar Hill Family Medicine. Care related to other health needs will not be discussed.

[12]The earlier records reflect a long-standing history of anxiety and depression. Plaintiff was treated with Xanax, Serzone, Lexapro, and Restoril. (Tr. 268, 273, 289).

[13]"Toradol is "a trademark for preparation of ketorolac tromethamine," which is "a nonsteroidal antiinflammatory drug administered intramuscularly, intravenously, or orally for short-term management of pain[.]" See Dorland's Illustrated Med. Dict. 1966, 998 (31st ed. 2007).

[14]Norflex is an injectable drug indicated as an adjunct to rest, physical therapy and other measures for the relief of discomfort associated with acute painful musculoskeletal conditions. See Phys. Desk. Ref. 1824 (60th ed. 1824).

spine were noted.  She was given prescriptions for Vicodin[15] and Flexeril.[16]  An MRI of the lumbar spine completed on February 2, 2006 indicated that the vertebral bodies were of average height and normally aligned, with no sign of compression deformity, bone destruction, offset, or marrow displacement process.  (Tr. 250, 174).  There was central disc protrusion at L2-3, but no sign of central canal or foraminal compromise.  However, there was a large fragment disc herniation at L5-S1 with significant pressure on the left S1 nerve root.  (Tr. 174).  Plaintiff received a prescription for Percocet[17] on February 3, 2006.  (Tr.249).

Plaintiff was examined by Kevin Rutz, M.D., an orthopedic spine specialist, on February 7, 2006.  (Tr. 206-08).  Plaintiff reported that she had injured her back about three weeks earlier.  She had pain in her low back and left posterior thigh and calf, and her symptoms had worsened with time.  She complained of appetite loss and diarrhea.  She reported a history of anxiety.  On examination, plaintiff was noted to be "in marked distress" with transfer from sitting to standing.  She had tenderness across the left buttock and lumbar spine area, and positive straight leg raise and cross-over sign on the left.  Restrictions in her range of motion were noted with forward flexion and extension.  She had full and painless ranges of motion of the hips and knees.  (Tr. 207).  Reviewing plaintiff's recent MRI, Dr. Rutz noted that she had "an extremely

---

[15]Vicodin is a narcotic analgesic indicated for relief of moderate to moderately severe pain.  Dependence or tolerance may occur.  See Phys. Desk. Ref. 530-31 (60th ed. 2006).

[16]Flexeril is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute musculoskeletal conditions.  See Phys. Desk Ref. 1832-33 (60th ed. 2006).

[17]Percocet is a combination of Oxycodone and Acetaminophen.  Ocycodone is an opioid analgesic indicated for relief of moderate to moderately severe pain.  It can produce drug dependence.  See Phys. Desk. Ref. 1114 (60th ed. 2006).

large left sided L5-S1 disc herniation with superior migration." He recommended surgical removal. (Tr. 208). Plaintiff underwent a microdiscectomy on February 20, 2006. (Tr. 181-82).

Dr. Rutz completed a post-surgical evaluation of plaintiff's condition on March 30, 2006. (Tr. 327). Plaintiff reported that she no longer had leg pain. She continued to have back pain, which Dr. Rutz attributed to degenerative disc disease. He referred plaintiff to Naseem A. Shekhani, M.D., a physiatrist, for nonoperative management of her pain.

Plaintiff saw Dr. Shekhani on April 4, 2006. (Tr. 211-12). She complained of pain in the lower extremities, low back, and neck. She stated that the pain radiated into both legs and was increased by activity and relieved by rest. She reported that she was having difficulty with the activities of daily living and was unable to work for more than 5 hours. She stated that her current level of pain was 5 on a 10-point scale, but increased with "aggravation." On examination, plaintiff had restricted range of motion of the neck. Dr. Shekhani noted tenderness in the paracervicals, right trapezius, anterior aspect of both shoulders, the paralumbar area, and parathoracic area. Her strength was undiminished. Phalen's test[18] and straight-leg raise test [19] were negative; Tinel's sign[20] was positive. Dr. Shekhani prescribed Ultram[21] and

[18]A reproduction of tingling with wrist flexion, suggestive of Carpal Tunnel Syndrome. The Merck Manual of Diagnosis and Therapy 334-35 (18th ed. 2006).

[19]When straight-leg raising induces muscle spasms it suggests intervertebral disk disease. The Merck Manual of Diagnosis and Therapy 325 (18th ed. 2006).

[20]Tinel's sign refers to distal tingling that occurs in response to tapping or palpation and may be a sign of nerve compression. See The Merck Manual of Diagnosis and Therapy 334,335, 339 (18th ed. 2006).

[21]Ultram is a centrally-acting synthetic opioid indicated for management of moderate to moderately severe chronic pain in adults who require around-the-clock

recommended that plaintiff start physical therapy and a home exercise program. Plaintiff was excused from work for two weeks.

At a follow-up visit on April 18, 2006, plaintiff reported improvement with physical therapy. (Tr. 213). She rated her pain level at 2 to 3 on a 10-point scale and described it as aching in nature. She continued to experience neck pain, however, and reported difficulty with self care and in doing her job. On examination, straight-leg raise test was negative and Tinel's sign was positive. No sensory deficits or weakness were noted. Dr. Shekhani renewed plaintiff's prescription for Ultram and directed plaintiff to continue with physical therapy and the home exercise program.

Plaintiff had an office visit at Cedar Hill Family Medicine on August 2, 2006. (Tr. 245). She presented with an antalgic gait. She reported that her sciatic pain had resolved but that she was unable to work due to persistent low back pain. She also reported that her referral for epidural corticosteroid injections had been delayed due to a potential worker's compensation claim. Dr. Depew excused her from work. Plaintiff's diagnoses on that date were panic disorder and degenerative disc disease of the lumbar spine; her medications included Naproxen, Xanax[22] and Restoril.

Plaintiff returned to Cedar Hill Family Medicine on December 14, 2006. She reported that she was experiencing neck and back pain after moving a couch. (Tr. 241). She had mild discomfort with palpation of the right trapezius area. She had normal ranges of motion of the neck, lower back, and hips; straight leg raising was

---

treatment of pain for extended periods of time. See Phys. Desk. Ref. 2428-29 (63rd ed. 2009) (discussing extended release product).

    [22]Xanax is indicated for the treatment of panic disorder. See Phys. Desk Ref. 2655-56 (60th ed. 2006).

negative.  She was prescribed Naprosyn[23] and Flexeril.  On January 8, 2007, she received prescriptions for Medrol[24] and Feldene.[25]  (Tr. 189).  On March 9, 2007, plaintiff reported that she had been unable to get out of bed for two days due to back pain from doing house work.  (Tr. 238).  She had discomfort with palpation of the lower back and some difficulty with extension of the lower back.  An MRI of the spine was ordered.

Plaintiff returned to Dr. Rutz on August 28, 2007.  (Tr. 317).  She reported that she had ongoing back and neck pain; her leg pain had not returned.  An MRI of the spine taken on March 27, 2007, demonstrated a small left-sided L5-S1 disc prominence with moderate disc degeneration.  Dr. Rutz opined that plaintiff had cervicalgia and discogenic low back pain.  He told plaintiff that the odds of a good outcome from lumbar fusion were about 60%.  He recommended physical therapy and told her that she would have to have a negative nicotine test before she could have a discogram.  On September 18, 2007, plaintiff discussed smoking cessation with Julie Epple, F.N.P., from Cedar Hill Family Medicine and received a prescription for Chantix.[26]  (Tr. 229).

---

[23]Naprosyn is a nonsteroidal anti-inflammatory drug used for relief of the signs and symptoms of tendonitis and pain management.  See Phys. Desk Ref. 2769-70 (60th ed. 2006).

[24]Medrol is the brand name for methylprednisolone, a corticosteroid, prescribed to relive inflammation.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682795.html (last visited on July 29, 2011).

[25]Feldene is the brand name for piroxicam, a nonsteroidal anti-inflammatory used to relive the symptoms of osteoarthritis and rheumatoid arthritis.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684045.html (last visited on July 29, 2011).

[26]Chantix is indicated for use as an aid to smoking cessation treatment.  Phys. Desk. Ref. 2789 (65th ed. 2011).

An examining consultant completed a Physical Residual Functioning Capacity Assessment on November 14, 2007. (Tr. 217-22). Based on a review of the medical records, the consultant determined that plaintiff can occasionally lift or carry 20 pounds and frequently carry 10 pounds. She can sit, stand, or walk about 6 hours in an 8 hour day, and had no limitations in pushing or pulling. The examiner noted that plaintiff "cares for children and pets with the help of a roommate. She takes her time doing cleaning and laundry. She can drive and shops for groceries and basic needs, but often has pain afterwards. [She] estimates that she can lift about 10 pounds, but has trouble squatting and bending. She can walk about 30 minutes, then needs to rest. [Her] alleged symptoms are consistent with the [medical evidence of record] and are generally credible." (Tr. 222). The examiner noted that plaintiff had been released by Dr. Rutz with light lifting restrictions and that his opinion was given controlling weight.

On January 29, 2008, plaintiff reported worsening pain in her upper back with some parathesias in the arms. (Tr. 225). She complained of difficulty with sleep. Dr. Depew added Buspar[27] to her medications, reduced the Xanax and continued the Restoril. Plaintiff continued to smoke and Dr. Depew ordered a chest x-ray.

An MRI of the cervical and thoracic spine was completed on February 6, 2008. (Tr. 311). A large disc protrusion was disclosed at C5-C6 with "significant" canal stenosis and neural foraminal narrowing, with cord displacement posteriorly. There

---

[27]Buspar, the brand name for buspirone, is used to treat anxiety disorders or in the short-term treatment of the symptoms of anxiety. http://www.nlm.nih.gov/med lineplus/druginfo/meds/a688005.html (last visited July 29, 2011).

was also an asymmetric smaller disc osteophyte complex[28] at multiple levels of the cervical spine.

On February 27, 2008, plaintiff reported that she was having a lot of pain in her neck. She received a prescription for Neurontin. (Tr. 438). On June 11, 2008, plaintiff presented with multiple complaints, including neck pain, bowel changes, and weight loss. Plaintiff reported that steroid injections worsened her neck pain and complained that Neurontin was not helping. (Tr. 437). On July 1, 2008, plaintiff complained of back pain and received a prescription for Tramadol. (Tr. 436). On July 14, 2008, she reported that the cervical spine surgeon to whom she had been referred did not accept Medicaid. (Tr. 433). On August 27, 2008, plaintiff reported that Tramadol was not providing relief. She also stated that the specialist did not have an opening for a Medicaid patient until November. (Tr. 431). On September 15, 2008, plaintiff requested that she be placed back on Restoril. (Tr. 429). On October 3, 2008, plaintiff received prescriptions for Naproxen and Celexa.[29] (Tr. 427). Plaintiff complained of ongoing neck pain on November 24, 2008. She received refills of Neurontin and Xanax. (Tr. 424). On February 24, 2009, plaintiff complained of worsening pain in her neck and low back, with numbness in her arms and left leg. She reported that she was having difficulty getting out of bed due to pain. On examination, she had a full range of motion at the neck and back, and negative straight leg raising. An MRI of her neck

---

[28]An osteophyte is a bony outgrowth or protuberance. Stedman's Med. Dict. 1285 (27th ed. 2000). Osteophytes form in the later stages of cervical disc disease and may impinge of nerve roots. 2 Richard M. Patterson, Lawyers Medical Cyclopedia § 16-10[A[ (6th ed. 2011).

[29]Celexa, or Citalopram, is prescribed to treat depression. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Nov. 6, 2009).

and back was ordered.  She was prescribed an increased dosage of Neurontin.  (Tr. 419).

Michael Spezia, D.O., completed a consultative examination of plaintiff on March 2, 2009.[30]  (Tr. 404-05).  On examination, Dr. Spezia noted that plaintiff had pain of the right shoulder, decreased range of motion of the cervical spine, and paravertebral muscle spasm of the lumbar spine.  Dr. Spezia's diagnoses were cervical and lumbosacral somatic dysfunction, cervical and lumbar myositis,[31] and cervical and lumbar disc disease with radiculopathy.  Dr. Spezia opined that plaintiff's prognosis was "guarded" due to "significant musculoskeletal conditions rendering her unable to perform the duties of regular full time employment without significant compromise." (Tr. 405).  Dr. Spezia determined that, in an 8-hour work day, plaintiff could sit for 30 minutes, stand for 15 minutes, and walk for 15 minutes.  She could continuously lift or carry up to 5 pounds, frequently lift up to 10 pounds, occasionally lift up to 20 pounds, and never lift 25 pounds.  (Tr. 406).  Her impairments would require her to take more than 3 breaks and to lie down or nap during an 8-hour workday; she would miss 2 work days per month.  The objective indications of pain included muscle spasm, reduced range of motion, and motor disruption; the subjective indications included complaints of pain, irritability, and grimaces.  Id.  Her pain would preclude her from persisting or focusing on simple tasks on a sustained full-time work schedule.

---

[30]Dr. Spezia's report incorrectly states that this examination was completed in March 2, 2007.  The accompanying documents establish that the examination occurred in 2009.  (Tr. 405, 408).  The ALJ adopted the incorrect date.

[31]"Myositis" means an inflammation of a muscle.  Stedman's Med. Dict. 1176 (27th ed. 2000).

An MRI of the cervical spine on March 6, 2009, was not significantly different from the MRI completed on February 6, 2008, and showed multilevel degenerative disease, which was greatest at C5-C6.  (Tr. 445).  The MRI of the lumbar spine showed a prominent central disc protrusion at L5-S1, disc space narrowing and osteophyte formation, consistent with degenerative disc changes.  (Tr. 446-47).

## IV.  The ALJ's Decision

In the decision issued on July 1, 2009, the ALJ made the following findings:

1. Plaintiff met the insured status requirements of the Social Security Act through March 31, 2011.

2. Plaintiff has not engaged in substantial gainful activity since January 30, 2006, the alleged date of onset.

3. Plaintiff has the following severe impairments:  L5-S1 disc herniation and narrowing of the disc space causing lumbar radiculopathy and resulting in a microdiscectomy.

4. Plaintiff does not have an impairment or combination of impairments that meets or substantially equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Plaintiff has the residual functional capacity to lift or carry 20 pounds occasionally and 10 pounds frequently; she can sit, stand or walk 6 hours in a workday; she can occasionally climb stairs and ramps, and stoop, kneel and crouch.  She can never climb ropes, ladders, or scaffolds, and can never crawl; she must avoid concentrated exposure to cold, wetness, and vibrations.

6. Plaintiff is able to perform some of her past relevant work.

7. Plaintiff is unable to perform any past relevant work.

8. Plaintiff was 34 years old, a younger individual, on the alleged date of onset.

9. Plaintiff has a limited seventh grade education and is able to communicate in English.

10. Plaintiff's skills from her past relevant work are not transferable.

11. Considering the plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the plaintiff can perform.

12. Plaintiff has not been under a disability, as defined in the Social Security Act, from January 30, 2006, through the date of the decision.

(Tr. 11-17).

## V. Discussion

To be eligible for disability insurance benefits, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 23 months." 42 U.S.C. §§ 423(d)(1)(A), 1382(a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." Nimick v. Secretary of Health and Human Servs., 887 F.2d 864, 868 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, he is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is

-15-

equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, he is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform his past relevant work. If the claimant can, he is not disabled. Fifth, if the claimant cannot perform his past relevant work, the ALJ determines whether he is capable of performing any other work in the national economy. If the claimant is not, he is disabled. See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

## A.    Standard of Review

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. Buckner v. Astrue, --- F.3d ---, 2011 WL 2803017, at *6 (8th Cir. July 19, 2011) (quotations and citation omitted).

## B.    Plaintiff's Allegations of Error

Plaintiff contends that the ALJ erred in making contradictory findings at Steps 4 and 5 of the sequential evaluation process; improperly evaluated the medical evidence; and incorrectly determined her Residual Functional Capacity.

## 1.    Alternative Findings in the Sequential Evaluation

At Step 4 of the sequential evaluation process, the ALJ found that plaintiff could return to some of her past relevant work as a product assembler and silkscreen printer, based on the Vocational Expert's testimony. "According to the expert, the claimant could perform each of these jobs either as they were generally performed or as the claimant formerly performed these jobs." (Tr. 15). The ALJ also found, however, that plaintiff could not perform any past relevant work and went on to identify other jobs that exist in the national economy that are consistent with the RFC he formulated. (Tr. 16).

Plaintiff first argues that the ALJ misstated the VE's testimony with respect to whether she could return to her past work as a product assembler or silkscreen printer. A review of the transcript indicates that the VE never opined that these jobs were among those that could be performed by a hypothetical individual with the limitations presented by the ALJ's hypotheticals. In addition, the ALJ's RFC determination had found that plaintiff should avoid prolonged exposure to vibration. There is no evidence in the record regarding whether these jobs satisfy this requirement. Thus, the ALJ's finding at Step 4 that plaintiff could return to her past work is unsupported by any evidence in the record.

The regulations provide that the five-step sequential evaluation process proceeds in a "set order" and a finding that a claimant is disabled or not disabled at any step ends the analysis. 20 C.F.R. § 404.1520(a). The finding that plaintiff could return to her past relevant work amounted to a finding at Step 4 that she was not disabled. Plaintiff argues that it was error for the ALJ to continue on to Step 5 and determine that she retained the RFC to perform other work available in the economy.

Defendant suggests that any error committed at Step 4 is moot because the ALJ properly consulted a VE at Step 5. As is discussed below, the Court finds that the ALJ's conclusion at Step 5 was based on an RFC that was not based on substantial evidence in the record. Thus, any error at Step 4 is immaterial and the Court declines to address the parties' dispute regarding whether the regulations permit the ALJ to make alternative findings.

### 2. The ALJ's Evaluation of the Medical Evidence

Plaintiff asserts several challenges to the ALJ's evaluation of the medical evidence.

**The January 30, 2006 MRI**: The ALJ stated that the MRI completed on January 30, 2006, did "little to bolster [her] allegations as of her alleged onset date." (Tr. 13). However, according to Dr. Rutz, the MRI disclosed that plaintiff had "an extremely large left sided L5-S1 disc herniation with superior migration," which required surgical removal. (Tr. 208). The ALJ agreed that plaintiff's "need for surgery suggests her impairments were serious." Id. Defendant acknowledges that the ALJ's statements are contradictory but suggests that the Court simply ignore the ALJ's statement that the MRI did not support plaintiff's claim as a deficiency in the opinion. The apparent contradiction is puzzling, but the Court agrees with defendant that any error is immaterial in light of the ALJ's finding that the disc herniation and surgery were severe impairments.

**Dr. Shekhani's findings**: The ALJ concluded that the results of Dr. Shekhani's examinations did not support plaintiff's claim that her symptoms resulted in ongoing disability following the surgery. (Tr. 13-14). The ALJ noted that Dr. Shekhani found plaintiff had full muscle strength, normal reflexes, no sensory deficits, negative straight

leg-raising, and tenderness on palpation. However, the ALJ did not address Dr. Shekhani's additional observations that plaintiff had positive Tinel's sign, restricted range of motion of the neck, and tender/trigger point on paracervicals and right trapezius. Defendant argues that an ALJ's failure to discuss a specific piece of evidence does not indicate that it was not considered. Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010). Upon remand, the ALJ will have the opportunity to consider whether Dr. Shekhani's additional findings support plaintiff's claim.

Pain Medication: According to the ALJ, Dr. Depew's notes of August 2, 2006, indicate that plaintiff was in pain, but did not require pain medication. The ALJ further stated:

> If the claimant were as limited in her capacity as a result of her spinal symptoms, including pain, it follows logically that she would take significant pain medications in an effort to remedy her symptoms enough to allow her to return to work. Instead, the claimant has taken no pain medications. This lack of intake of pain medications in inconsistent with the claimant's allegations that her spinal impairments were significant enough to result in disability.

(Tr. 14).

The ALJ's assessment is contradicted by the record on two counts: On August 2, 2006, plaintiff was taking Naproxen, a nonsteroidal anti-inflammatory drug used for relief of the signs and symptoms of tendonitis and pain management. See Phys. Desk Ref. 2769-70 (60th ed. 2006). Second, the medical record establishes that since her alleged date of onset plaintiff has been prescribed Naproxen, Ultram, Flexeril, Neurontin, Vicodin, Percocet, Darvocet, and Tramadol---all medications used for the treatment of pain. Plaintiff was also referred for epidural corticosteroid injections. (Tr. 245). The ALJ improperly relied on an incomplete review of the medical record to determine that plaintiff's allegations of disabling symptoms were not credible. In addition, to the extent that the ALJ's RFC determination failed to take into account

limitations arising from these medications it is not supported by substantial evidence on the record.

Plaintiff testified that "I think if I didn't have [the medication] I'd be really bad." Defendant cites this statement as evidence that plaintiff's symptoms were controlled by medication. Thus, defendant contends, the ALJ's failure to address plaintiff's medication is immaterial because "[a]n impairment that can be controlled by treatment or medication is not considered disabling." Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009). Presumably the medication provided some therapeutic relief, but this statement, alone, is not sufficient to establish that plaintiff's pain was "controlled" by medication.

**Plaintiff's Treatment Record:** The ALJ found that plaintiff did not seek aggressive treatment for her spinal impairment. (Tr. 15). The ALJ did not address eleven medical appointments between December 14, 2006, and November 24, 2008, in which plaintiff complained of significant pain in the back or neck. The ALJ also did not address plaintiff's stymied attempts to obtain corticosteroid injections (Tr. 245) and to locate a surgeon who accepts Medicaid to perform spinal fusion. (Tr. 433).

**Opinion of Dr. Spezia:** Dr. Spezia found that plaintiff had lumbosacral dysfunction, cervical and lumbar myositis, and disc disease with radiculopathy, and was limited to lifting no more than 5 pounds, sitting no more than 30 minutes at a time, and standing or walking no more than 15 minutes at a time. He also opined that plaintiff's pain would preclude persisting or focusing on simple tasks on a sustained basis. (Tr. 406-07). The ALJ discounted Dr. Spezia's opinion as unsupported by the observations of Drs. Shekhani, Rutz, and Depew.

Dr. Spezia incorrectly dated his report, stating that his examination occurred in 2007 rather than 2009. The ALJ adopted the incorrect date and thus was at a disadvantage when comparing Dr. Spezia's findings with the rest of the record. The 2008 MRI revealed that plaintiff had developed a large disc protrusion and disc osteophyte complex at multiple levels of the cervical spine, an indication that plaintiff's spinal impairments were worsening. (Tr. 311, 15). The ALJ might have viewed Dr. Spezia's findings in a more positive light had he known that his assessment occurred after objective evidence established that plaintiff's condition had deteriorated. This, in turn, might have resulted in a different assessment of the limitations Dr. Spezia imposed.

The ALJ discounted the limitations found by Dr. Spezia as inconsistent with his observation that plaintiff had full extremity strength. "One would expect to see some extremity strength loss or atrophy . . . if [plaintiff's] impairments are as significant as she alleges." (Tr. 14). The medical record does not indicate one way or the other whether the conditions giving rise to plaintiff's allegedly disabling conditions would also cause loss of strength or atrophy. The ALJ's observation is thus not supported by substantial evidence on the record.

Plaintiff may or may not be disabled within the meaning of the Social Security Act, but the errors in the ALJ's review of the medical evidence preclude a finding that his decision is supported by substantial evidence.

### 3. The ALJ's RFC Determination

"RFC is defined as the most a claimant can still do despite his or her physical or mental limitations." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration, and citations omitted). "The ALJ bears the primary

responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." Id. (citation omitted). "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." Id. Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006)).

Based on his review of the medical evidence and his credibility determination, the ALJ determined that plaintiff had the RFC to lift or carry 20 pounds occasionally and 10 pounds frequently and to stand, walk, or sit for 6 hours of an 8-hour work day. (Tr. 12). This was the RFC developed by the Social Security examining consultant on November 14, 2007, approximately 18 months before the ALJ's decision was issued. The MRIs in 2008 and 2009 showed an ongoing deterioration in plaintiff's spine condition and there is no means of knowing what the consultant's assessment of this new evidence would have been. In addition, the errors detailed above may have influenced the ALJ's RFC determination. If on remand it appears that plaintiff's limitations are more severe, the RFC determination must be adjusted accordingly.

## VI. Conclusion

The inconsistencies cited here prevent the Court from determining whether the ALJ's conclusion that plaintiff is not disabled is supported by substantial evidence on the record as a whole.

Accordingly,

-22-

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

 

 

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 16th day of August, 2011.